Filed 12/29/20  P. v. Johnson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>THOMAS MAURICE JOHNSON,<br><br>     Defendant and Appellant. | C086549<br><br>(Super. Ct. No. CM044296) |

In the predawn hours of February 17, 2016, a resident of a home that backed up to a bike trail in Chico heard a woman yelling "rape" and "fire," and called 911.  When a police officer arrived at the bike trail, he saw defendant Thomas Maurice Johnson approximately 50 to 75 feet away, pants around his knees, emerge from shrubs beside the bike trail and flee.  The officer then saw Jane Doe, whose pants were down below her

1

buttocks emerge from the same area.[1]  Defendant was ultimately apprehended with the help of a canine officer and arrested after a struggle.

Jane Doe testified that defendant had grabbed her, pulled her off of the bike trail, and told her to drop her pants.  She testified that defendant "put his hand down [her] throat and pulled out scar tissue" several times during the attack, leading to injuries to her throat.

Defendant, who testified at trial, offered a very different account.  He described a drug deal gone bad.  He testified that he agreed to sell Jane Doe crystal methamphetamine.  He gave her a plastic bag containing methamphetamine, and, in return, she gave him only $5, significantly less than it was worth.  When he attempted to get the methamphetamine back from Jane Doe, she swallowed it.  He put his fingers down Jane Doe's throat, trying to force her to spit up the swallowed drugs.  He fled when police arrived because he had drugs on him.  His pants, defendant told the jury, sagged a little below his waist, but not below his knees.

Defendant was charged with kidnapping to commit rape, assault with intent to commit rape and/or other sex offenses, and resisting an executive officer.  Great bodily injury enhancements were also alleged.  A jury found defendant not guilty of kidnapping to commit rape, but guilty of the lesser included offenses of simple kidnapping and felony false imprisonment.  The jury also found defendant not guilty of assault with intent to commit rape, but found him guilty of the lesser included offense of simple assault.  Additionally, he was found guilty of resisting an executive officer.  The jury further found true the great bodily injury enhancement allegations regarding Jane Doe in connection with the simple kidnapping and felony false imprisonment convictions.  The trial court sentenced defendant to an aggregate term of 11 years eight months.

---

[1]  The victim was referred to in the trial court as Jane Doe.

2

On appeal, defendant asserts: (1) his conviction of false imprisonment must be reversed because it is a necessarily lesser included offense of kidnapping, both of which were lesser included offenses under count 1, kidnapping to commit rape; (2) the trial court erred in prohibiting trial counsel from cross-examining Jane Doe concerning prior inconsistent statements and her mental and emotional instability 14 months after the incident; (3) the trial court erred in excluding the testimony of a defense expert who would have testified about police investigations, procedures, and crime scene investigations, and the crime scene processing that occurred in this case; (4) the trial court erred in excluding a defense expert offered to testify as to the physical characteristics of crystal methamphetamine; (5) the prosecutor committed prosecutorial misconduct in his rebuttal closing argument (a) by discussing matters not in evidence, specifically the legal ramifications for false statements in a search warrant affidavit, misstating the law, and improperly vouching for the prosecution's witness, (b) in arguing matters not in evidence to improperly vouch for Jane Doe's credibility and by misstating the law when discussing her testimony, and (c) by suggesting that defendant had other unknown victims, thus arguing facts not in evidence, inviting the jurors to speculate defendant had committed similar crimes, and appealing to the passions and prejudices of the jurors;[2] (6) the cumulative effect of the errors deprived him of a fair trial; (7) the trial court erred in failing to stay punishment for assault pursuant to Penal Code section 654;[3] and (8) we must remand the matter to the trial court for a hearing on defendant's ability to pay fines, fees, and penalty assessments pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

---

[2] Defendant separately asserts that his trial counsel were constitutionally ineffective for failing to object to several instances of the alleged prosecutorial misconduct.

[3] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

Because false imprisonment is a lesser included offense to kidnapping, we reverse the conviction of felony false imprisonment and the true finding on the great bodily injury enhancement allegation attached to that conviction and vacate the sentences imposed thereon. We also order execution of the sentence imposed on the assault conviction stayed pursuant to section 654.

Otherwise, we shall affirm, concluding that, although there were several errors, defendant was not prejudiced, individually or cumulatively. We also conclude that he is not entitled to an ability to pay hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendant was charged by criminal information with kidnapping to commit rape (§ 209, subd. (b)(1); count 1), assault with intent to commit rape and/or other sex offenses (§ 220, subd. (a)(1); count 2), and resisting an executive officer (§ 69; count 3). In connection with count 1, the information alleged that defendant personally inflicted great bodily injury on the victim within the meaning of section 12022.7, subdivision (a). In connection with count 2, the information alleged that defendant inflicted great bodily injury on the victim during the commission of an assault with the intent to commit rape within the meaning of section 12022.8.

### The Prosecution's Evidence

**Jane Doe's Testimony**

In 2016, Jane Doe was using pain medication, marijuana, and methamphetamine. She had been living that lifestyle for "about eight or nine years, on and off." She acknowledged she had been convicted of welfare fraud and was still on probation. And she acknowledged that use of methamphetamine was a violation of probation. On cross-examination, she acknowledged that she had also been arrested in Texas.

On February 17, 2016, Jane Doe went for a walk. She had consumed methamphetamine. She went to Walgreens and to 7-Eleven on East Avenue to buy

4

cigarettes and candy. After she exited 7-Eleven, she encountered defendant. Defendant walked with Jane Doe briefly. After three to five minutes, the two parted ways.

Jane Doe later came to a bike path. She testified that, as she was starting to cross the bike path, defendant suddenly grabbed her from behind "kind of in a neck hold" and pulled her onto the bike path. Jane Doe begged defendant not to hurt her. Defendant told her to be quiet, and he pulled her off onto the dirt to the side of the bike path.

Jane Doe testified that she tried to scream, but that defendant "was just too strong for" her. She testified that defendant "kept [her] from screaming by pulling the scar tissue out of [her] neck and . . . making it unable for [her] to talk." According to Jane Doe, defendant did that three or four times. She testified she "saw bits and pieces of . . . [her] neck thrown onto the pavement."

Jane Doe testified: "I was put to the pavement a couple of times. We were kind of in the dirt and on the bike path at the same time for maybe, I'm not sure how long, but just for a short bit. I lost consciousness many times, two or three times . . . ." Jane Doe testified that, at the time she lost consciousness, she was about six feet onto the bike path.

At some point, defendant told Jane Doe to drop her pants. She tried to resist, but eventually she did what defendant said because she was afraid he was going to kill her. She testified she dropped her pants and then her head hit the pavement. She could not recall what happened after that.

**The 911 Caller's Testimony**

Stacy Morgan lived in a house that backed up to the bike path. Morgan heard a woman screaming, "He's going to rape me. Help. Help." After speaking to a 911 operator, Morgan looked outside and saw defendant run towards her neighbor's yard, pulling his pants up. Defendant jumped into Morgan's neighbor's yard. Morgan remembered talking to detectives later in the morning. She told them that she heard a female yell, " 'Rape, fire,' " twice.

**Police Response to the Scene and Investigation**

At approximately 5:15 a.m., Sergeant Todd Lefkowitz of the Chico Police Department responded to the bike path. Lefkowitz described the location of the bike path where he responded as just north of East Avenue. People's exhibit 8, an aerial view, shows the bike path, in the middle of the block running north and south between and parallel with White Avenue and Pillsbury Road, and running perpendicular to East Avenue, across the sidewalk and into a crosswalk across East Avenue. From East Avenue, Lefkowitz drove his vehicle onto the bike path at a 45-degree angle, facing northwest, unable to turn fully onto the bike path. He directed his spotlight down the bike path. Lefkowitz saw a bicycle on the bike path. After a few seconds, he saw defendant, pants down around his knees, jump out from the shrubs east of the bike path onto the bike path approximately 50 to 75 feet from where Lefkowitz stopped his vehicle. Lefkowitz testified that only defendant's pants were down, not his underwear. Defendant looked in Lefkowitz's direction and then turned and ran. Defendant had difficulty running because his pants were around his knees. Defendant attempted to mount the bike, but fell. He tried to pull his pants up and get on the bike again, and, when that failed, he ran and jumped over a backyard fence.

Lefkowitz backed his vehicle up, and then successfully turned completely onto the bike path. As he did so, he saw Jane Doe come out onto the bike path from the shrubs to the east of the bike path. Lefkowitz testified that Jane Doe "presented herself very similar to how [defendant] presented himself, from my right, which is the east side of the bike path, from the shrubs, and stepped out onto the asphalt-paved bike path." She emerged from the shrubs at the same distance as defendant. Both defendant and the

victim "presented themselves" at a distance of 50 to 75 feet from Lefkowitz's vehicle.[4] The victim was very disheveled, covered in dirt and leaves, her face was bloody, and her pants were down below her buttocks.

Meanwhile, officer Richard Hartman, who was nearby in the area, saw defendant. Hartman warned defendant that, if he did not stop, Hartman would release his canine partner, Luna. Defendant ran and Hartman released Luna. Luna apprehended defendant, and he went to the ground. Hartman jumped on top of defendant while another officer handcuffed him. Defendant continued to struggle and he bit Hartman's wrist. After defendant was detained, an officer searched him and found in his front pockets an empty condom wrapper. An officer who subsequently collected swab samples from defendant testified that defendant's fingernails were "pretty long."

Jane Doe was sent to the hospital in an ambulance. She was in pain, she was frightened, and she was having difficulty breathing because of her throat. She was bleeding on the inside of her neck and from where her head hit the pavement.

Officer Hartman spoke with Jane Doe at the hospital. She told Hartman that prior to the incident, she had gone to the Donut Nook, bought coffee and a donut, and left. She did not tell Hartman that she went to 7-Eleven or Walgreens. Jane Doe told Hartman that, during the first time she was with defendant, at some point, defendant reached his hand towards her groin. Jane Doe stopped defendant's hand before he could touch her and told him that was "no way to treat a woman." However, in her direct examination, Jane Doe testified that there was no point before the incident on the bike path when defendant tried to touch any part of her body.

---

[4] In their briefing both parties indicate they understand Lefkowitz's testimony to mean Jane Doe emerged from the shrubs in the same area where he had first seen defendant. We agree with this interpretation.

7

Officer Jamie McElhinney and her field training officer, Officer Travis Johnson, arrived at the bike path. McElhinney's role that morning was to survey and collect evidence. On cross-examination, McElhinney acknowledged that, as of the date of the incident, she had been on the police force for approximately three weeks and this incident was the first time that she placed evidence placards. Officer Johnson supervised her while she was doing so.

On the sidewalk 10 to 15 feet to the west of the entrance to the bike path, McElhinney located a bag containing a wallet and cigarettes.[5] People's exhibit 29 depicts the bike path as photographed from the sidewalk. Six evidence placards can be seen in the near foreground on and to the immediate east of the bike path. A shoe was located approximately 20 feet from the start of the bike path. A second shoe was also located.[6] The distance from the wallet, located on the sidewalk near the entrance to the bike path, to the shoe located in foliage farther north along the bike path, was approximately 47 feet. McElhinney also measured drag marks "starting from around the same area that the first items were located in the foliage to further down to where that last placard was where [a] cable lock was located." That distance was approximately 50 feet. The total distance "from the drag marks to the wallet and cigarettes" on the sidewalk was approximately 97 feet. The drag marks themselves were approximately 50 feet. The drag marks appeared in "the foliage and the dirt area on the right-hand side of the bike path . . . ." There were several drag marks, and it "appeared that a scuffle had occurred. The foliage, dirt, rocks were disturbed in that area and not any other areas that were noticeable. Also, it was right in the area where the evidence items were collected, such as the shoe." McElhinney also located a belt in a backyard in the area where defendant

---

[5] As defendant latter established in his case-in-chief, the wallet and cigarettes apparently belonged to Jane Doe.

[6] The evidence does not clearly establish whether these were Jane Doe's shoes.

was first contacted by law enforcement.  McElhinney testified that it "sound[ed] right" that she told Detective Dane Gregory that Jane Doe was dragged approximately 150 feet based on Jane Doe's statement and evidence observed at the scene.  However, McElhinney further testified that that distance may have been an estimate, and that the actual measurements may have been taken after Gregory left the scene.  Gregory testified that he agreed with the opinion of other officers that Jane Doe was dragged 97 feet.

McElhinney acknowledged that none of the photographs she had been shown during her testimony showed drag marks.

**Medical and DNA Evidence**

A nurse who performed a forensic medical examination of Jane Doe observed an abrasion to Jane Doe's soft pallet towards the back of her mouth.  The injury was consistent with having been inflicted by a fingernail.  Jane Doe also had abrasions to her tongue, and abrasions and swelling to the back of her throat.

On cross-examination, defendant's trial counsel elicited from Jane Doe that she suffered from a condition known as Barrett's esophagus.  Barrett's esophagus is a change to the lining of the esophagus caused by significant reflux.  Jane Doe acknowledged that she had problems with her esophagus prior to this incident, but further testified that the issue did not result in problems in her throat.

A senior criminalist from the California Department of Justice testified that a DNA sample found underneath defendant's left fingernails was from a female, and the profile matched the reference profile for Jane Doe.

9

## The Defense Evidence

### Defendant's Testimony

Defendant testified that at approximately 3:00 a.m. the morning of the incident, he received a call from someone who wanted to purchase crystal methamphetamine and cocaine from him. Defendant left his apartment at 3:00 or 3:15 a.m. on his bike.[7]

Defendant rode his bike to the apartment of a friend, C.J., who lived across the street from the location where he was going to meet his buyer.[8] He looked through her window, but the window was blocked by a mattress. Defendant opened the window, but he did not see anyone in the house, so he left.

Jane Doe approached defendant on the street. Defendant and Jane Doe began to walk together, talking. They also smoked marijuana together.

At some point, defendant went across the street to make a call. He then retrieved his bike, and he and Jane Doe parted ways. At that time, according to defendant, Jane Doe appeared to be under the influence of methamphetamine.

Defendant's buyer did not show up. Defendant headed towards the bike trail, intending to go home. He was on the sidewalk next to the bike trail when Jane Doe walked up to him. She asked defendant if he had any more crystal methamphetamine. She had seen that defendant had methamphetamine when he took out the marijuana earlier. Defendant responded that he did, and Jane Doe asked to buy some.

Defendant testified that, because it was close to 5:00 a.m. and there were people out going to work, he wanted to move away from the sidewalk to give Jane Doe the

---

[7] The bicycle on the bike trail in a crime scene photograph was defendant's bicycle.

[8] On cross-examination, defendant acknowledged that he previously had a sexual relationship with C.J. However, he testified that the last time he had sex with her was "a long time ago." The prosecutor repeatedly implied, through cross-examination, that defendant went to C.J.'s house for sex, and, frustrated, he turned his attention to the victim. Defendant denied all of this.

methamphetamine. According to defendant, they walked about five or six feet from the sidewalk onto the dirt area adjacent to the bike trail.

The methamphetamine defendant had was packaged in a plastic sandwich bag, the end of which he had burned so as to harden and seal it. According to defendant, the methamphetamine itself was "like shards, like glass, like crystal shards . . . ." Defendant testified that "if you . . . would have squeezed it, the bag, it would poke through the bag or you probably get a puncture wound because it's hard, it's like . . . sharp pieces of glass."

Defendant handed Jane Doe the baggie, containing approximately a gram and a half of methamphetamine. She gave him $5. Defendant testified that the methamphetamine he gave her was "way too much for $5." It was worth $30 to $40. As defendant tried to get the methamphetamine back from Jane Doe, she "threw it in her mouth" and swallowed it. Defendant put his fingers in Jane Doe's mouth, trying to force her to gag so that she would "spit it back up," which she did. She then jumped on top of it on the ground and curled up in a fetal position. Defendant tried to move Jane Doe while the two of them were on the ground in an attempt to get his methamphetamine, and the two tussled. Jane Doe started screaming and hollering, and defendant heard her yell "rape" and "fire." Defendant saw the methamphetamine and grabbed it.

Defendant testified he heard sirens approaching and saw a police officer in a vehicle coming towards him. He grabbed his bike and started trying to ride away. The police officer stopped his vehicle, jumped out, and yelled something. Defendant dropped his bike and jumped over a fence. Defendant did not stop when ordered to do so by the officer because he had methamphetamine and cocaine on him and he "didn't want to get arrested for them at the moment." Defendant testified, "I had real baggie pants on," and explained "they wouldn't have been down to my knees or nothing like that, but they were probably down a little bit past my waist."

11

When he dove over the fence, defendant's belt got caught on the fence, and he "was hanging there for a minute . . . ." Eventually, he unfastened his belt, took it off, and got down from the fence.

Defendant testified that, at the time, he had the methamphetamine in his hand and cocaine in his pocket. He also had a bottle of alcohol, a cigarette pack, and a condom in his pocket. He testified that, usually, when he carried drugs, he also carried a condom so that, if "police get on" him, he can "throw [the drugs] up in the condom and just swallow it." After he got off of the fence, defendant put the methamphetamine and cocaine in the condom, tied it off, and swallowed it.

Defendant saw police officers looking for him. He stayed where he was for a long time, until many of the officers left the area. When he thought it was clear, he jumped over a fence into a front yard. Defendant saw two officers and, when they were approximately 10 or 15 feet away from him, he ran again, but ran into a trash can and fell down. One police officer pointed a gun at defendant, and the other officer released his dog, which attacked defendant. The dog bit both of defendant's legs. Defendant was then handcuffed by officers. Defendant testified that he did not intentionally bite an officer, but that the officer may have been bit when he put his arm over defendant's face to try to make him stop yelling.

Defendant testified that Jane Doe's account of what happened was not true.

**Evidence from the Crime Scene**

The defense called Detective Gregory, the lead detective on this case. Gregory acknowledged that he collected cigarettes and a wallet from evidence and gave them back to Jane Doe "the next day." Gregory also acknowledged that an item of evidence from the crime scene, a woman's shoe, appeared in two different photographs accompanied by two different evidence placards. Gregory identified in photographs additional instances of the same item of evidence photographed with two different evidence placards and numbers.

12

**Medical and Toxicological Evidence**

Dr. Jennifer Ward treated Jane Doe at the hospital. Dr. Ward testified that Jane Doe reported to her that " 'a man put his hand in [her] throat and tried to rip [her] guts out.' " She also claimed that the man tried to kill her. Dr. Ward noted in her report that Jane Doe was "groggy appearing initially," and that she was "somewhat intoxicated." The toxicology screen of Jane Doe's urine yielded positive results for "opiates . . . amphetamines, methamphetamine, benzodiazepine, and cannabinoids."

**Dishonesty Character Evidence Regarding Jane Doe**

Imogean Dodson (Imogean) met Jane Doe in 2001 at a "clean and sober living environment" and they were good friends. Imogean was married to Jane Doe's former husband, Gerald Dodson (Gerald). Imogean testified that, in 2016, Jane Doe came into their living room, without permission, when they were asleep and stole credit cards and an ATM card from Imogean's purse, as well as other items. Imogean woke up to find Jane Doe "hovering over our bed." Jane Doe asked Gerald for the keys to the Dodson's Escalade. According to Imogean, Jane Doe "believed that she was living there." Gerald took Jane Doe to "the Jesus Center," but Jane Doe returned to the Dodson's house shortly thereafter. The Dodsons had to call the police to have Jane Doe removed from their house. Imogean opined that Jane Doe was not an honest and truthful person.

Officer Dan Wilson testified that in 2015, he arrested Jane Doe for shoplifting.

**Character Evidence Regarding Defendant Indicating No Sexual Deviance**

Baljit Atwal, Ph.D., a clinical psychologist with a specialty in forensics, testified that she was retained by the defense to evaluate defendant's general psychological functioning, his mental status, and his risk of sexual offending behavior. Dr. Atwal testified that on a sexual offending risk assessment test, defendant "scored very low in being at risk to commit a sex offense, to commit either rape or child molestation or exhibitionism." She further testified that defendant scored as a very low risk for "deviancy or characteristics of someone who would commit rape, violent sexual acts" on

13

that test. Defendant also scored in the low-risk range for violence and antisocial behavior. Dr. Atwal opined that defendant did not have the characteristics of someone who would commit a violent sexual offense. She testified that there was nothing in his personal history or his test results to indicate sexual deviance. Dr. Atwal testified that defendant was not a sexual predator.

Chassidy Walker, Cedar Hernandez, and Durell Siplin testified as character witnesses for defendant. Walker had known defendant for approximately 15 years. Hernandez thought of defendant as a brother. Siplin testified that defendant was "a best friend of mine," "more like a brother," whom Siplin had known for approximately 20 years. Walker, Hernandez, and Siplin all testified that defendant did not have a reputation in the community as someone who would kidnap a woman for the purpose of committing rape or assault a woman for the purpose of committing rape. Walker testified that defendant's "character in the community is someone who is consistent and loving and caring, not a man that has been accused of these charges." Hernandez testified defendant was a family man who worked mornings and stayed home the rest of the day to care for his family. Siplin testified that defendant was "a dedicated father, . . . he's very committed to his family, and . . . he's very committed to his friends as well."

### The Prosecution Rebuttal Evidence

Detective Kevin Hass testified that, in his experience as a narcotics officer, he never heard of anyone getting a cut by touching a methamphetamine shard. Hass acknowledged that crystal methamphetamine looks like shards of glass. He testified that it "appears like it's hard, but yet you can break it." Hass never heard of anyone getting any kind of injury from hiding methamphetamine inside the mouth or in a body cavity. And he had never seen a crystal methamphetamine shard hard enough to puncture a plastic baggie.

Detective Gregory testified that he prepared a search warrant for defendant's Facebook account. He acknowledged stating in his affidavit to secure the warrant that

14

Lefkowitz told him that "as he drove his patrol vehicle north onto the bicycle path, he observed a black adult male suspect with his pants *and underwear* pulled down to his knees on the ground." (Italics added.) With regard to Jane Doe, Gregory stated in the affidavit that she told him she had left the Donut Nook and thereafter ran into defendant. Gregory did not recall Jane Doe saying anything about 7-Eleven or Walgreens. Gregory acknowledged that nowhere in the affidavit did he indicate that Jane Doe was dragged during the encounter at the bike trail. The affidavit also indicated that, according to Jane Doe, defendant pulled her pants down rather than that she pulled her pants down as ordered by defendant. Gregory acknowledged that, in his affidavit, he stated that there were six different Facebook messages exchanged between defendant and C.J. over a span of time leading up to the alleged incident. However, he further acknowledged that there were actually only two messages exchanged between them over that time.

### Stipulation - Doe's Preliminary Hearing Testimony

The parties stipulated to the following: "At the defendant's preliminary hearing . . . Jane Doe testified under oath that on February 17th, 2016, she stopped at a donut store. [¶] At the defendant's preliminary hearing . . . Jane Doe testified under oath that on February 17th, 2016, the defendant . . . tried to remove her pants. [¶] Three, at the defendant's preliminary hearing . . . Jane Doe testified under oath that other than her conviction for welfare fraud, she had no other convictions. [¶] Four, at the defendant's preliminary hearing . . . Jane Doe testified under oath that other than her arrest for welfare fraud, she had never been arrested. [¶] Five, at the defendant's preliminary hearing . . . Jane Doe testified under oath that she did not go into 7-Eleven on February 17th, 2016."

### Verdicts and Sentencing

On count 1, the jury found defendant not guilty of kidnapping to commit rape (§ 209, subd. (b)(1)), but found him guilty of the lesser included offenses of kidnapping (§ 207, subd. (a)) and felony false imprisonment (§ 236, subd. (a)). The jury found true

the special allegation that, in the commission of kidnapping and felony false imprisonment, defendant personally inflicted great bodily injury on Jane Doe within the meaning of section 12022.7, subdivision (a). On count 2, the jury found defendant not guilty of assault with intent to commit rape (§ 220, subd. (a)), but found him guilty of the lesser included offense of assault (§ 240). On count 3, the jury found defendant guilty of resisting an executive officer. (§ 69.)

The court denied probation and sentenced defendant to an aggregate term of 11 years eight months, calculated as follows: the upper term of eight years on count 1, kidnapping (§ 207, subd. (a)), a concurrent term of six months on count 2, assault (§ 240), eight months, one-third the midterm, on count 3, resisting an executive officer (§ 69), and three years on the section 12022.7, subdivision (a), great bodily injury enhancement in connection with count 1.[9]

## DISCUSSION

### I. Felony False Imprisonment as a Lesser Included Offense of Kidnapping

Defendant asserts that his conviction of felony false imprisonment must be reversed because it is a necessarily lesser included offense of kidnapping. The Attorney General concedes the point, and we agree.

"[I]t is generally permissible to convict a defendant of multiple charges arising from a single act or course of conduct. [Citations.] However, a 'judicially created

---

[9] The court also imposed the upper term of three years on count 1, felony false imprisonment, and stayed execution of that sentence pursuant to section 654, and imposed but stayed sentence on the section 12022.7, subdivision (a), personal infliction of great bodily injury enhancement specifically attached to the felony false imprisonment conviction. As we shall discuss in part I. of the Discussion, *post*, we reverse the felony false imprisonment conviction because it is a lesser included offense of kidnapping and vacate the sentenced imposed thereon. We will therefore also reverse the true finding on the section 12022.7, subdivision (a), enhancement attached to the false imprisonment conviction and vacate the sentence imposed on that enhancement.

16

exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' [Citation.] [¶] When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736 (*Sanders*), italics omitted.)

"A defendant guilty of kidnaping, as defined by either section 207 or 209 of the Penal Code, must necessarily be guilty of the 'unlawful violation of the personal liberty of' his victim and therefore be guilty of false imprisonment as defined by section 236." (*People v. Morrison* (1964) 228 Cal.App.2d 707, 713.) It is well-settled that false imprisonment is indeed a lesser included offense of kidnapping. (See, e.g., *People v. Magana* (1991) 230 Cal.App.3d 1117, 1120-1121; *People v. Patrick* (1981) 126 Cal.App.3d 952, 965; *People v. Ratcliffe* (1981) 124 Cal.App.3d 808, 819-820.)

Here, defendant was convicted of both simple kidnapping and felony false imprisonment as lesser offenses to the original charge on count 1, kidnapping to commit rape. Because felony false imprisonment is a lesser offense to kidnapping and defendant was convicted of both offenses for the same act or course of conduct, the necessarily lesser included offense of false imprisonment must be reversed. (*Sanders, supra*, 55 Cal.4th at p. 736.)

## II.  Limitation of Cross-examination of Jane Doe

### A.  Additional Background

In anticipation of Jane Doe's testimony, the prosecutor moved in limine to establish the extent the defense would be permitted to cross-examine her about her criminal and mental health history. The prosecutor noted that there was a report documenting a call on April 27, 2017, more than 14 months after the charged incident, in which Detective Gregory informed dispatch that he would be taking Jane Doe to a mental

17

health facility. The prosecutor objected to any questioning about that incident and any reference to mental or behavioral health treatment.

Defendant's trial counsel asserted that "we have that interview . . . wherein she was [Welfare and Institutions Code section] 5150.[10] That is highly relevant to the defense's case to her credibility insofar as it describes her mental health state during that period . . . ." Trial counsel asserted that Jane Doe made statements during that interview "about this particular incident that are very inconsistent with her other statements. So it goes toward her credibility and to impeachment. And it definitely goes toward, in addition, her mental health issues."

Subsequently, the prosecutor reiterated his request to have any evidence concerning Jane Doe's psychological history excluded. The prosecutor stated that he was moving to exclude evidence "of any kind of behavior other than the felony conviction" pursuant to Evidence Code sections 352, 786, and 788. The prosecutor further stated that Jane Doe was invoking the psychotherapist-patient privilege.

Trial counsel disputed whether the privilege applied, asserting that at issue were not matters derived from Jane Doe's relationship with any mental health professional. Counsel noted that Jane Doe had been diagnosed with and treated for serious mental illness. And counsel emphasized the occasion when Jane Doe "was 5150," she talked about the charges, and she "specifically says . . . there was one more there . . . than one dude when I was on the path that night, . . . and I know that they raped me really bad, and that they choked me until I was dead and for a short time but I know that it was a lot

_____

**10** Welfare and Institutions Code section 5150 provides, in relevant part: "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probable cause, take . . . the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment . . . ." (Welf. & Inst. Code, § 5150, subd. (a).)

18

worse than I thought." Counsel asserted that these matters went directly to Jane Doe's credibility, the most crucial issue in the case. Further, counsel emphasized that the jury remained unaware of Jane Doe's mental health issues and that those issues affected her ability to perceive reality and to recall events accurately. Counsel asserted that prohibiting the defense from cross-examining Jane Doe on these matters violated due process and defendant's Sixth Amendment rights to confront and cross-examine witnesses against him. Counsel further asserted that the prosecution's contention that the evidence should be excluded pursuant to Evidence Code section 352 was "silly" given the importance of the evidence and defendant's potential exposure. Additionally, counsel noted that, among the considerations relevant to witness credibility set forth in Evidence Code section 780 is the "extent of [the witness's] capacity to perceive, to recollect, or to communicate any matter about which" the witness testifies. (Evid. Code, § 780, subd. (c).)

The trial court ruled that it would "deny the use of any mental health or behavioral health information or incident effectively sustaining the objection on the claim of the psychotherapist-patient privilege." The court stated that "statements attributed to Jane Doe are said to be in the context of emotional distress . . . to the degree of that distress that Jane Doe sought treatment through behavioral health. The statements made in that context, in the Court's mind, are unreliable." The court further stated that no evidence suggested that Jane Doe was "in any similar state during the time that this crime occurred. There's been no evidence that the Court has heard yet that Jane Doe was in a persistent delusional state or detached from reality at the time of the crime." Additionally, the court stated that nothing it had heard suggested that Jane Doe was unable to perceive or recall events due to her mental condition. The court did not see any correlation between Jane Doe's mental health history and statements she made at the time of treatment and her credibility.

Trial counsel asserted that Jane Doe's statement to Gregory, that she was raped by multiple people was (1) not made to a mental health professional but to a law enforcement officer, and (2) directly in conflict with her trial testimony. Counsel argued, "if nothing else, we should be able to just state, you were interviewed on that date, and on that date she said that there was more than one dude who was on the path that night, and that they raped me." The trial court stated: "[t]hat was on the heels of seeking treatment. The Court's finding that statements made in that context are unreliable, so the Court is not going to allow questioning in that area."

## B. The Parties' Contentions

Defendant asserts that the trial court erred in prohibiting the defense from cross-examining Jane Doe concerning these prior statements and her mental and emotional state. Specifically, defendant sought to cross-examine her concerning (1) statements she made to Detective Gregory on April 27, 2017, and (2) her mental and emotional status on that date. According to defendant, the trial court's refusal to allow cross-examination on these matters was erroneous because Jane Doe's statements on that date were "unreliable" and the defense's theory was that Jane Doe was unreliable and not credible. Her credibility, according to defendant, was the most crucial issue in the case. Defendant also emphasizes the differences between Jane Doe's trial testimony and her account of the incident given to Gregory on April 27, 2017, and specifically that it involved multiple assailants and that she died briefly. Defendant further emphasizes the fact that Jane Doe continued to insist that defendant ripped tissue out of her throat and threw it on the ground, claims that were not grounded in reality. Defendant asserts that the trial court's error in refusing to allow the defense to cross-examine Jane Doe concerning her prior statements and her mental and emotional instability deprived him of his rights of confrontation, to present a defense, to a fair trial, and to due process.

The Attorney General responds that Jane Doe's mental health and her statements in April 2017 were not relevant to defendant's attack on Jane Doe 15 months earlier,[11] that her statements were potentially privileged to the extent they were made to a psychotherapist, and that the evidence would have been unduly prejudicial. The Attorney General emphasizes here, as in the trial court, that there was no evidence Jane Doe suffered symptoms at the time of the attack similar to those she suffered when she was apparently committed under Welfare and Institutions Code section 5150 in April 2017. The Attorney General further maintains that, even if the precluded evidence was relevant, the trial court properly precluded it under Evidence Code section 352 because the evidence would have been unduly prejudicial.

As we shall explain, while we agree with the People that Jane Doe's mental health status was not admissible, we agree with defendant that Jane Doe's statements to Gregory were admissible as prior inconsistent statements. However, we conclude the error in precluding the statements was harmless.

### C. The Admissibility of Evidence and the Right to Cross-examination

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) "Speaking more particularly, it examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in

---

[11] We calculate the time span to be a little more than 14 months.

21

question.  [Citations.]  That is because it so examines the underlying determination as to relevance itself."  (*Id*. at pp. 717-718.)  A trial court abuses its discretion when its ruling " ' "falls outside the bounds of reason," ' " or where the trial court " ' "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*People v. Fuiava* (2012) 53 Cal.4th 622, 663 (*Fuiava*), quoting, parenthetically, *People v. Osband* (1996) 13 Cal.4th 622, 666 & *People v. Carrington* (2009) 47 Cal.4th 145, 195.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights.  Our high court has emphasized the word 'substantial' in [Evidence Code] section 352.  [Citations.]  [¶]  Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value.  [Citations.]  A trial court's exercise of discretion [under Evidence Code section 352] 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168.)

"A criminal defendant has a constitutionally guaranteed right to confront and cross-examine the witnesses against him or her."  (*People v. Carter* (2005) 36 Cal.4th 1114, 1172, citing U.S. Const., 6th & 14th Amends. & *Pointer v. Texas* (1965) 380 U.S. 400, 403-405 [13 L.Ed.2d 923].)  The "Sixth Amendment right to confront witnesses includes a right to meaningful cross-examination."  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1746.)  The "right of confrontation includes the right to cross-examine

22

adverse witnesses on matters reflecting on their credibility," but " 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 623, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674].) "Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i. e.*, discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316 [39 L.Ed.2d 347, 353].) As defendant asserts, "the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591-592 (*Gurule*).) We review a contention that the trial court improperly limited cross-examination in violation of the defendant's right to confrontation for an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 765, citing *People v. Linton* (2013) 56 Cal.4th 1146, 1188.)

## D. Analysis

### 1. Statements Jane Doe Made to Gregory on April 27, 2017

Defendant's trial counsel argued that, on April 27, 2017, when Jane Doe "was 5150," she talked about the charged events with Gregory and she "specifically says . . . there was one more . . . dude when I was on the path that night, . . . and I know that they raped me really bad, and that they choked me until I was dead and for a short time but I know that it was a lot worse than I thought." Separate from evidence of the Welfare and Institutions Code section 5150 commitment, Jane Doe's statement to Gregory was relevant, as it directly addressed the circumstances surrounding the charged offenses and was inconsistent with other statements she made and her trial testimony. Thus, it was "evidence that was relevant to the credibility of a witness" and had a tendency in reason

to prove or disprove a "disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Thus, contrary to the Attorney General's contention, these statements were relevant.

Further, to the extent that the prosecutor objected to the admission of the statements on Evidence Code section 352 grounds, and to the extent the trial court considered such grounds in precluding the evidence, we conclude that this was an abuse of discretion. The probative value of the statements was high. They were statements Jane Doe made concerning the occurrence of the charged offenses that were inconsistent with her trial testimony and earlier statements she made to the police. And the probative value of these statements relative to Jane Doe's credibility was enhanced by their contents: her assertion that she was attacked by multiple people, choked, raped "really bad," and almost killed. We conclude that this probative value was not substantially outweighed by the risk that admission of the statements, or cross-examination of Jane Doe about them, would necessitate undue consumption of time. (Evid. Code, § 352.) The evidence would have been admitted through Gregory, and it would take him very little time to relay the brief statements summarized *ante*. Moreover, the significant probative value of this evidence would not have been substantially outweighed by the probability that its admission would "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.) The evidence of these statements would neither confuse the issues nor mislead the jury; on the contrary, it would give the jury more information about defendant's accuser, her credibility, and her account of the charged offenses. Further, we cannot conclude that the probative value of this evidence to defendant's case would have been substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice to Jane Doe. Indeed, the People have not cited any authority to support a contention that the prejudice concern in Evidence Code section 352 extends to a prosecution witness. Additionally, we note that the trial court's determination that these statements should not be admitted based on its

24

determination that they were unreliable is not supported in the law. Reliability is not an Evidence Code section 352 counterweight. Nor is reliability required before prior inconsistent statements can be admitted for purposes of credibility.[12]

Indeed, the People have not cited any statute or case that supports the exclusion of this evidence on the basis relied upon by the trial court. Instead, on appeal, the People rebrand the rationale of the trial court's ruling, contending that "even if statements Doe made during the mental health crisis could be deemed relevant, the trial court reasonably excluded the evidence under Evidence Code section 352. Any statements Doe made in the midst of a mental-health crisis more than a year after the events in question lacked credibility and provided minimal probative value of what had actually occurred in 2016." But the defense never offered these statements for the truth of the matter. Instead, they offered them precisely because they lacked credibility and because they were inconsistent with other statements Jane Doe had made. If the prosecution desired to introduce the circumstances under which the statements were made, it would have been up to them to do so. Neither the statements, nor the circumstances under which they were made implicated the psychotherapist-patient privilege.[13]

_____

[12]  Before *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177], confrontation clause analysis required a showing of indicia of reliability as a predicate to the admission of statements of a hearsay declarant offered by the prosecution, but even then that requirement applied only if the prosecution was unable to produce the declarant and the declarant was shown to be unavailable. (*People v. Zapien* (1993) 4 Cal.4th 929, 957.) The requirement to show indicia of reliability did not apply when the declarant testified and was subject to cross-examination by the defense. (*Ibid.*)

[13]  The prosecution in the trial court and the Attorney General on appeal assert that this evidence was properly precluded under the patient-psychotherapist privilege. (See Evid. Code, § 1014.) However, there is no indication that any statements made by Jane Doe that defendant sought to introduce were made to a psychotherapist and thus subject to the patient-psychotherapist privilege. They were made to Gregory, a law enforcement officer. To the extent defendant sought to introduce records or other material that could be covered by the patient-psychotherapist privilege, we need not discuss the matter

25

Thus, we conclude the trial court abused its discretion in precluding Jane Doe's April 27, 2017, statements to Gregory or cross-examination of Jane Doe about them. We address prejudice *post*.

### 2. Jane Doe's Mental and Emotional State on April 27, 2017

Conversely, we conclude that the trial court did not abuse its discretion in precluding the defense from establishing Jane Doe's mental and emotional state as of April 27, 2017. Jane Doe's mental and emotional state more than 14 months after her encounter with defendant were not relevant to the defendant's defense. (Evid. Code, § 210.) Defendant did not establish any connection between Jane Doe's mental and emotional state on February 17, 2016, the day of the incident, and her mental and emotional state on April 27, 2017, the day she was apparently committed under Welfare and Institutions Code section 5150. Thus, the evidence was not relevant to Jane Doe's mental and emotional state at the time of the charged offenses. Additionally, defendant established no connection to Jane Doe's testimony, more than five months later. Consequently, the evidence was not relevant to the credibility of her trial testimony. Accordingly, we conclude that the trial court did not abuse its discretion in precluding this evidence.

Defendant relies on *Gurule, supra*, 28 Cal.4th 557, asserting that it is similar to the circumstances of this case and is controlling. However, the issue decided in *Gurule* is not the same as here. In *Gurule*, our high court considered the pretrial discovery of the psychiatric records of a codefendant turned prosecution witness. (*Id.* at pp. 587-595.) Here, we address the preclusion at trial of evidence concerning a victim's mental and emotional state more than 14 months after the charged offenses and more than five months before trial. *Gurule* is authority for the proposition that "the mental illness or

---

further, as we next conclude it was not an abuse of discretion to preclude evidence of her mental and emotional state in April 2017.

emotional instability of a witness *can be relevant on the issue of credibility*, and a witness may be cross-examined on that subject, *if such illness affects the witness's ability to perceive, recall or describe the events in question*." (*Gurule*, at pp. 591-592, italics added.) However, defendant has not established that the mental or emotional instability of Jane Doe on April 27, 2017, was potentially relevant to her credibility at trial. Nor has he established any relevance of her mental state on that date to her ability to perceive, recall or describe the events in question, either on February 17, 2016, when the charged offenses occurred, or when she testified at trial in October 2017.[14]

We conclude that the trial court did not abuse its discretion in precluding the cross-examination of Jane Doe on matters related to her mental and emotional state on April 27, 2017.

### E. Prejudice Regarding Exclusion of the April 27, 2017 Statements

Defendant asserts that an analysis of whether he was prejudiced by the trial court's error in precluding the subject evidence must be considered under the harmless-beyond-a-reasonable-doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*), because the error infringed on his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608; accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Geier*, at p. 608; *People v.*

---

[14] For this same reason, we further conclude that, even if the trial court erred in precluding evidence of Jane Doe's mental and emotional stability on April 27, 2017, any such error was harmless under any standard.

27

*Livingston* (2012) 53 Cal.4th 1145, 1159.) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), citing *People v. Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).) The Attorney General counters that the error was harmless under any standard.

We conclude that the error in precluding Jane Doe's statements to Gregory on April 27, 2017, was, indeed, harmless even under *Chapman*. Notwithstanding the preclusion of the prior inconsistent statements to Gregory on April 27, 2017, the defense was permitted to cross-examine Jane Doe thoroughly. Through its cross-examination, the defense explored inconsistencies in her account of the incident. The parties also entered into the stipulation which contained matters inconsistent with Jane Doe's trial account. The defense also cross-examined Jane Doe about her criminal history and her drug use. The jury had the opportunity to watch Jane Doe's testimony, observe her demeanor, and assess her credibility. The defense presented the testimony of Imogean Dodson, who testified about Jane Doe breaking into her house, stealing from her, and expressing the obviously mistaken belief she lived in the Dodson house. Imogean also testified that she did not believe Jane Doe was truthful. Introduction of evidence concerning Jane Doe's mental state when she made the inconsistent statements to Gregory on April 17, 2017, ultimately may have harmed defendant's defense because a jury could have inferred her mental state on that day resulted from the trauma of what happened on the night of the charged offenses.

In any event, the jury found defendant not guilty of both kidnapping to commit rape and assault to commit rape. Thus, the jury rejected Jane Doe's testimony that she had been the victim of sexual assault. Instead, the jury found defendant guilty of simple assault and that finding was consistent with defendant's own version of the incident indicating that he reached down Jane Doe's throat to make her gag his methamphetamine

28

back up. As for the kidnapping and false imprisonment, those lesser offenses were supported by Lefkowitz's testimony. Lefkowitz testified that he saw defendant emerge from the bushes 50 to 75 feet up the bike path from where Lefkowitz initially parked upon driving onto the entrance of the bike path. Shortly thereafter, he saw Jane Doe emerge from the shrubs in the same area where he had seen defendant. Therefore, the preclusion of Jane Doe's inconsistent account to Gregory on April 27, 2017, as to how the sexual assault occurred was without consequence.

Based on the foregoing, we conclude that the error in precluding Jane Doe's statements to Gregory on April 27, 2017, was harmless beyond a reasonable doubt. There is no " ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*Reese, supra*, 2 Cal.5th at p. 671; *Aranda, supra*, 55 Cal.4th at p. 367; see *Chapman, supra*, 386 U.S. at p. 24; *Aledamat, supra*, 8 Cal.5th at p. 3.)

### III. Refusal to Allow Defense Expert Williams to Testify

### A. Additional Background

Defendant's trial counsel indicated his intent to call Tim Williams, a former Los Angeles Police Department detective and "police procedure expert," to offer his opinion on "the investigation, the crime scene, the manner in which evidence was collected and preserved." He would also "testify about proper investigation and crime scene techniques, analysis of the evidence as how this investigation was conducted." According to counsel, Williams had testified "at least a hundred times" concerning, among other things, police procedure.

The prosecutor opposed Williams's proposed testimony, asserting that there had "been no allegations . . . that there's been any kind of issues with evidence tampering or contamination. There's no evidence that any particular items of evidence weren't collected."

The court noted that defendant, who had testified, "put himself at the crime scene." The court continued: "There's been very little evidence collected. He's

29

admitted to putting his hand in the alleged victim's mouth. One of the pieces of evidence is the DNA under the fingernail. And these are areas . . . that are not . . . outside the province of the jury to determine such that expert testimony is needed to assist them in their deliberations. [¶] And so that will be the Court's ruling."

When it became clear to defendant's trial counsel that the trial court had precluded Williams's testimony in all areas, he requested an Evidence Code section 402 hearing. The trial court responded that it "ha[d] ruled." Counsel replied: "Mr. Williams and I have marked more than 20 photos. These were photos taken . . . during their investigation. These are photographs, and he is an expert in evidence collection, he is an expert and testified multiple times in evidence collection preservation, whether or not it is preserved properly, how it is collected. [¶] We have photos of people that we intend to use with him where they are using with their hand, touching pieces of evidence, which is directly in conflict with Officer McElhinney's testimony. There are different photos of same pieces of evidence with different photo markers. Multiple, multiple problems with this crime scene. They have not been presented to this jury. But the two photographs that have been presented to the jury by the district attorney, . . . one of them has a photo marker 40, one of them has a photo marker 3. They are the exact same piece of evidence and they have not been presented as such to the jury. Mr. Williams has analyzed and looked over every picture that was taken in this case, every procedure, every report, everything with regard to how the evidence was collected, preserved, maintained, tested, what wasn't collected, how it wasn't collected, and proper police procedure in this type of a rape case. He is an expert witness in criminal procedure, crime scene investigation, and he has done this and testified not only for the defense, mostly for the prosecution in this regard." Additionally, counsel argued that McElhinney testified there were drag marks at the crime scene, but drag marks did not appear in the photographs introduced at trial. McElhinney's testimony was that the drag marks appeared in other photographs, but those photographs were not shown at trial. According to counsel, Williams looked at

30

"every photograph" and he would opine that there was "no evidence from any of the photographs of the crime scene or the evidence collected from [Jane Doe] that would indicate that she was dragged at all."  Trial counsel suggested that the court conduct a hearing to consider Williams's experience, and continued:  "this is an evidence scene that is contaminated, it is untrustworthy, and the jury should be able to not only see the entire crime scene as it was actually that evening, but how the photo marker -- or the evidence markers were moved, removed, and changed.  And that it is improper police procedure and it is absolutely proper for us to put up an expert to testify in that regard."  Counsel stated that presenting expert opinion evidence concerning "shoddy police investigations," improper evidence collection, and crime scene errors is something that is neither novel nor uncommon.

The court was not persuaded by counsel's arguments and ruled:  "given the evidence that we have, the Court does not see that there's relevance to the line of inquiry."  The court returned to the fact that defendant "admitted to being there and putting his hand inside of the victim's mouth," and noted that the photographs and evidence placards were not shown to the jury.

### B.  Defendant's Contentions

Defendant asserts that the trial court erroneously excluded Williams's testimony, denying him his rights to a fair trial and to present a defense.  According to defendant, Williams's proposed testimony was highly relevant to rebut the testimony of law enforcement officers and to impeach their credibility.  In contrast to the limited scope of relevance the court assigned to the proffered evidence, defendant asserts that Williams's testimony was relevant to rebut the allegations that Jane Doe was dragged, to impeach the credibility of Gregory and McElhinney, and to interpret the photographic and physical evidence in connection with the alleged dragging.  Williams's testimony was also relevant because, as defendant emphasizes, McElhinney lacked any technical training, and yet she "was placed in charge of identifying, marking, and collecting evidence at the

31

scene, despite the fact that she had been a sworn officer for only two months and she had never processed any crime scene before." The proffered evidence also would have been relevant to the practice of using different evidence placards to mark the same items of evidence, and to rebut Gregory's testimony that there were not common standards for crime scene processing and evidence collection. Even if some aspects of Williams's proposed testimony was within the common knowledge of jurors, other aspects were not; his expert testimony thus would have aided the jury, and the trial court abused its discretion in ruling otherwise. In the absence of Williams's testimony, there was no evidence to rebut the testimony of McElhinney and Gregory relevant to the crime scene and the purported drag marks.

We agree with defendant to the extent that Williams was prepared to testify about the absence of drag marks.[15]

## C. The Admission of Expert Testimony

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*), citing Evid. Code, §§ 720, 801.) "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known

---

[15] As for other aspects of proposed testimony critiquing the crime scene investigation, we conclude defendant has failed to establish the trial court abused its discretion in precluding testimony on what amounted to collateral matters not directed specifically to material evidence in the case. For example, the discrepancy related to the evidence placards marking the location where the shoes were found was inconsequential since those shoes were not tied to Jane Doe or the events underlying the charges.

to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.) Our high court has stated that " 'expert opinion testimony " 'will be excluded [on Evidence Code section 801 grounds] only when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*People v. Brown* (2014) 59 Cal.4th 86, 101 (*Brown*).) " 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*Ibid.*)

### D. Analysis

We conclude that the trial court abused its discretion in precluding Williams's testimony relative to the drag marks.

There was no assertion or determination that Williams lacked " ' "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion.' " (*Vang, supra*, 52 Cal.4th at p. 1044, citing Evid. Code, §§ 720, 801.)

In its offer of proof, the defense stated that Williams would have testified about the absence of photographic or other crime scene evidence, other than McElhinney's testimony, to prove the existence of the drag marks. This was relevant to the kidnapping and false imprisonment charges. It would have had some "tendency in reason to … disprove a[] disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

It cannot be said that Williams's proffered testimony " ' " 'would add *nothing at all* to the jury's common fund of information,' " ' " or that " ' " ' "the subject of inquiry

33

is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Brown, supra*, 59 Cal.4th at p. 101.) Williams's testimony would have been relevant to impeach the testimony of law enforcement about the drag marks and would have been relevant to assessing the credibility of McElhinney and Gregory on this point.

In arguing that there was no abuse of discretion here, the Attorney General relies on the fact that defendant thoroughly cross-examined McElhinney and Gregory. The Attorney General further emphasizes that the defense made use of the testimony revealed on cross-examination in closing arguments. However, these are matters more aptly addressed to prejudice than to whether the trial court abused its discretion in precluding the defense's expert witness. Cross-examination of prosecution witnesses is not a substitute for the presentation of relevant, qualified, and probative evidence from a defense expert.

Thus, the trial court abused its discretion in preventing the defense from presenting Williams's relevant testimony concerning the lack of drag marks.

### E. Prejudice

Errors in excluding expert testimony are analyzed under the state law standard for prejudice in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Stoll* (1989) 49 Cal.3d 1136, 1163; accord *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively*

34

weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, at p. 956.)

As emphasized by the Attorney General, the defense thoroughly cross-examined McElhinney about her lack of experience and training and her actions at the crime scene. Through its cross-examination of McElhinney and Gregory, the defense laid bare the shortcomings in the processing and preservation of the crime scene. Through this cross-examination, the defense made clear to the jury that there was no photographic evidence showing drag marks, despite the fact that McElhinney insisted they were present at the crime scene and that the drag marks were depicted in photographs. It emphasized the absence of any evidence of drag marks other than law enforcement testimony.

As we have noted, Lefkowitz testified he saw defendant emerge from the bushes some 50 to 75 feet up the bike path from where he stopped his vehicle at the beginning of the bike path, and thereafter, saw Jane Doe emerge from the same bushes. Jane Doe was very disheveled, covered in dirt and leaves, her face was bloody, and her pants were down below her buttocks. Thus, it can be inferred from this evidence without Jane Doe's testimony that defendant forcibly moved Jane Doe into the bushes. Moving her even this short distance under the circumstances of this case, was sufficient to satisfy the asportation element of kidnapping. (See § 207; *People v. Gomez* (2018) 6 Cal.5th 243, 303-304 [discussing asportation element].) The movement increased the risk of harm to Jane Doe, as defendant moved her to a more secluded area, decreased the likelihood of detection for the same reason, " 'and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' " (*Gomez*, at p. 304, quoting *People v. Martinez* (1999) 20 Cal.4th 225, 237, overruled on another ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.)

As for defendant's testimony, he never explained why Lefkowitz witnessed him emerging from the bushes so far up the bike path. Defendant did acknowledge he and Jane Doe walked from the sidewalk five to six feet up the bike path where they would be

less readily observed by commuters going to work. He said he told Jane Doe to step over to a dirt area off of the bike path. Defendant insisted that, when he got the methamphetamine back from Jane Doe, they were still five or six feet from the East Avenue entrance to the bike trail. He testified that he took a couple of steps towards East Avenue, saw the police coming, turned around, and went north. That is when he tried unsuccessfully to ride away on his bike, which explained why the bike was farther north on the bike path from where he interacted with Jane Doe. However, given the actual distance up the bike path where Lefkowitz saw defendant and Jane Doe emerge from the bushes, the short distance defendant claimed they moved from the sidewalk, and Jane Doe's physical condition, the jury could have reasonably inferred defendant was not truthful about their movements and that defendant actually physically moved Jane Doe to the location where he was later seen emerging from the bushes by Lefkowitz.

Other than the alleged drag marks, this was not a case which depended heavily upon evidence recovered from the crime scene. Rather, the location where defendant and Jane Doe were discovered, defendant's flight from the crime scene and then resisting arrest, and the DNA evidence were among the most significant components of the prosecution's case. We conclude that it is not reasonably probable that defendant would have obtained a more favorable result had Williams been permitted to testify about the lack of drag marks. (*Watson, supra*, 46 Cal.2d at p. 836.)

### F. Constitutional Claims and the Ineffective Assistance of Counsel

The Attorney General asserts that defendant's constitutional claims are forfeited because he failed to raise them in the trial court.

In connection with Williams's proposed testimony, trial counsel did not make specific reference to the right to present a defense, the right to a fair trial, and the deprivation of due process. "An appellate contention that the erroneous admission or exclusion of evidence violated a constitutional right is not preserved in the absence of an objection on that ground below." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320,

36

fn. 10 (*Daniels*), citing Evid. Code, §§ 353, 354.) "By failing to object below, defendant forfeited his claim that the exclusion of this evidence violated his constitutional rights . . . ." (*Daniels*, at p. 320, fn. 10.)

In his opening and reply briefs, defendant asserts that his trial attorneys were constitutionally ineffective for failing to raise the constitutional grounds he asserts on appeal. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.)

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

Here, we turn directly to prejudice. The *Watson* standard for harmless error is substantially the same as the prejudice prong of *Strickland*. (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 (*Ocegueda*).) For all of the same reasons we discussed *ante* in our *Watson* analysis, we conclude that, even if defendant's trial attorneys' performance was deficient for failure to raise the constitutional grounds upon which he relies on appeal, he was not prejudiced as a result.

## IV. Refusal to Allow Defense Expert Northom to Testify

### A. Additional Background

The defense sought to call Shon Northom, a criminal defense attorney, to testify concerning the physical characteristics of methamphetamine in response to the testimony of Hass, the prosecution's narcotics expert who testified in the prosecution rebuttal case.

The prosecutor objected to Northom's proposed testimony, asserting that, while Northom was a defense attorney and previously was a deputy district attorney, he had no law enforcement experience. Thus, the prosecutor maintained the Northom was not an "appropriate expert witness in the subject."

Defendant's trial counsel noted that Hass was expected to testify that methamphetamine shards are not sharp. Counsel asserted that Northom's experience was extensive. He was a criminal defense attorney. He handled cases involving methamphetamine and was very familiar with methamphetamine of all types. He was a Sacramento County district attorney for eight years, specifically handling cases involving methamphetamine in the narcotics unit. He also prosecuted methamphetamine cases in Tehama County. He provided monthly training to law enforcement concerning narcotics,

38

and he attended the monthly narcotics "TAGME" meetings, "which are the same meetings on the CV of Detective Hass, which he only has 20 hours of and Mr. Northom has many more hours and much more experience than that."[16] Northom had also prosecuted thousands of cases and handled hundreds more as a defense attorney. According to counsel, Northom was very familiar with methamphetamine and its appearance.

The prosecutor again objected to Northom's proposed testimony, asserting that he had no investigatory experience and no academic experience related to sales of narcotics. Trial counsel represented that Northom had extensive experience in training as well as prosecuting cases involving crystal methamphetamine. He had also handled it, had been involved in clandestine lab cases, and he had trained police officers. Counsel asserted that Northom had trained many police officers, "and he may have trained Detective Hass." Counsel then suggested an Evidence Code section 402 hearing.[17] Counsel further emphasized the limited nature of Northom's proposed surrebuttal testimony. He was only being offered to testify as to the "quality and nature and the substance itself, . . . the characteristics of the crystal methamphetamine . . . ." Northom's proposed testimony

---

[16] Detective Hass testified that he participated in 20 hours of training at Tehama and Glenn Methamphetamine Enforcement, or TAGME. He acknowledged that, in his experience, district attorneys sometimes taught sessions at the training programs he attended.

[17] Defendant's trial counsel likely intended to request an Evidence Code section 802 hearing rather than an Evidence Code section 402 hearing. Evidence Code section 802 provides,: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion *and the matter* (*including, in the case of an expert, his special knowledge, skill, experience, training, and education*) *upon which it is based*, unless he is precluded by law from using such reasons or matter as a basis for his opinion. *The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based*." (Italics added.)

was limited to a description of the physical characteristics of crystal methamphetamine. Counsel further stated that Detective Hass was specifically asked, "whether or not he could get a puncture wound from crystal meth, from shards from glass, and he said no. Mr. Northom can say otherwise, from training and experience. And he has handled more meth I'm sure than him, and he has been part of many of the same things he has."

The court refused to allow Northom's testimony. The court was "not persuaded that Mr. Northom has *the same expertise or greater* of Detective Hass; also, that the narrow issue on which Northom is being proffered warrants the consumption of time in that what would need to be gone into so the jury could assign weight to his testimony would devolve into a trial on the expertise of Mr. Northom." (Italics added.) The court later continued: "The Court is ruling in light of the extensive cross-examination of Detective Hass by the defense; concerned under 352, the undue consumption of time to litigate the qualifications of Mr. Northom. The Court does see a distinction between Mr. Northom and his experience and Detective Hass, between a deputy district attorney and 20-year plus law enforcement officer who has worked with the task force in the capacity of investigating crimes rather than litigating them. And so the Court is going to preclude the witness." The court again repeated its opinion that allowing Northom to testify would result in undue litigation concerning Northom's qualifications, and that the consumption of time would outweigh the probative value of the evidence proffered.

After a recess, following an invitation by the court to do so, the defense came back with additional information. Trial counsel indicated that Northom had indeed worked on buy-bust operations, and had been the head of several of them. According to counsel, Northom had extensive experience running narcotics investigations.

The court remained unpersuaded. The court seemed to suggest that the defense's cross-examination of Hass was sufficient evidence on the subject for the jury's consideration.

40

## B. Defendant's Contentions

Defendant asserts that the trial court abused its discretion in precluding Northom from testifying as to the physical characteristics of methamphetamine. This evidence was relevant to prove whether Jane Doe's throat injuries were caused by an assault by defendant or instead by swallowing crystal methamphetamine, the latter being the defense theory. Defendant emphasizes that Hass testified about the physical characteristics of methamphetamine and that the issue was obviously relevant, and asserts that the defense should have been permitted to present its own expert on the subject. Defendant also emphasizes that the physical characteristics of methamphetamine are beyond the common experience of jurors such that an expert's testimony would be of assistance. Defendant asserts that the court was wrong to exclude Northom's testimony because he may not have had equivalent experience to that of Hass; defendant argues there is no requirement of equivalent expertise. Defendant further asserts that the trial court abused its discretion in disallowing Northom's testimony under Evidence Code section 352 based on undue consumption of time. According to defendant, he was denied his right to present a defense, and was denied due process and a fair trial. Defendant asserts that this error was prejudicial under any standard. Again, defendant asserts that, to the extent that counsel failed to preserve the constitutional claims for appellate review, he was denied the constitutionally effective assistance of counsel.

As we shall explain, we conclude the trial court abused its discretion by precluding this testimony. However, the error was harmless and nonprejudicial.

## C. Analysis

The trial court was not persuaded as to Northom's experience as it related to the basis for his proffered testimony. However, we conclude that the offer of proof established that Northom was sufficiently qualified to testify concerning the physical characteristics of crystal methamphetamine. He had spent years as a narcotics prosecutor, and thereafter worked as a defense attorney, in both roles participating in

41

numerous cases involving methamphetamine. He taught educational programs concerning narcotics to law enforcement. He was very familiar with methamphetamine and its appearance. He had handled crystal methamphetamine, had been involved in clandestine lab cases, and supervised buy-bust operations and had experience running narcotics investigations.

We conclude that, like Williams, Northom had " ' "special knowledge, skill, experience, training, or education" in a particular field [so as] to qualify as an expert witness [citation] and to give testimony in the form of an opinion.' " (*Vang, supra*, 52 Cal.4th at p. 1044, citing Evid. Code, §§ 720, 801.) To be sure, Northom's background, training and experience was different from that of Hass, but it was more than sufficient to support the proffered testimony. Moreover, as asserted by defendant, " ' " '[w]here a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility.' " ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 536, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 321-322.)

Northom's very limited expert opinion was proffered as the "quality and nature and [methamphetamine] itself, . . . the characteristics of the crystal methamphetamine . . . ." This is related to "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Moreover, this evidence was plainly relevant to a disputed fact of consequence at defendant's trial. (Evid. Code, § 210.)

As with Williams's proffered testimony, it cannot be said that Northom's testimony " ' " 'would add *nothing at all* to the jury's common fund of information,' " ' " or that " ' " ' "the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Brown, supra*, 59 Cal.4th at p. 101.)

42

The Attorney General asserts that the trial court was properly concerned with the undue consumption of time in litigating Northom's qualifications. We cannot agree that either the consideration of Northom's qualifications or the presentation of his substantive testimony would have consumed an undue amount of time within the meaning of Evidence Code section 352. The trial court was offered Northom's curriculum vitae. Based on the curriculum vitae, the offer of proof and the prosecution's opposition, it is clear that any time consumed examining Northom about his expertise would have been neither lengthy nor "undue." Indeed, there was simply only so much the prosecution could elicit in an effort to undermine the breadth of his experience.

The Attorney General further asserts that the court properly excluded Northom's testimony based on its limited probative value given the facts that the actual methamphetamine at issue was never recovered, and because Hass had already agreed that it was hypothetically possible for methamphetamine to puncture a plastic baggie. Again, we disagree. The evidence was relevant and highly probative of defendant's position that Jane Doe sustained the injuries to her throat from swallowing crystal methamphetamine. Moreover, Northom would essentially offer testimony diametrically opposed to that of Hass, leaving the jury to make its determination.

We conclude that the trial court abused its discretion in preventing the defense from presenting Northom's relevant and limited testimony.

## D. Prejudice

Hass testified that he had never heard of anyone getting a cut by touching a methamphetamine shard. He acknowledged that crystal methamphetamine can have an appearance like shards of glass, although he further testified that, while it appears hard, "you can break it." However, Hass also acknowledged on cross-examination that different people preparing methamphetamine attain different results, and while some may prepare methamphetamine that appears hard but is flaky, "other times it can be much harder." He also testified that, while he had not encountered methamphetamine that was

43

hard enough to puncture a plastic baggie, he was not inclined to say that it could *never* happen.

The evidence established that Jane Doe sustained abrasions to the inside of her throat. She testified, albeit in sensational fashion, that defendant caused her injuries by putting his hands down her throat and pulling out scar tissue from inside her throat. An officer who collected swab samples from defendant testified that defendant's fingernails were "pretty long." The abrasion to Jane Doe's soft pallet towards the back of her mouth was consistent with having been inflicted by a fingernail. A DNA sample found underneath defendant's left fingernails was from a female consistent with Jane Doe's profile.

In closing argument, addressing great bodily injury, trial counsel argued that defendant had not reached six or seven inches down Jane Doe's throat and cut her with his nails. Rather, according to counsel's arguments, it was more reasonable to conclude that defendant was simply trying to get his drugs back after Jane Doe swallowed them. Counsel argued that Jane Doe sustained injuries to her throat because, as the evidence established, she had a condition known as Barrett's esophagus which caused "previous problems with indigestion and GERD such that her throat had preexisting injury. She would be more subject to this type of an injury." Counsel further argued: "You heard testimony from [defendant] about this being glass. The type of methamphetamine it is. It is a very sharp. [*sic*] It is different than most methamphetamine, powder methamphetamine." Counsel emphasized that Hass had been shown photographs of methamphetamine in which the drug looked like shards of glass. Counsel argued that, while Hass testified that the methamphetamine looked sharp but could be easily crushed, the reality was that the shards of methamphetamine "can certainly poke through a bag, and they can certainly cause an injury to your throat." Counsel continued: "[t]hese are just many different forms of ice, of glass, some are thin shards, some are thick shards, some are big ones. For them to say there's no way that that injury was caused by this, is

44

not consistent with what we know about crystal methamphetamine, and Officer Hass had to agree with."

Thus, the defense challenged Hass's testimony on the sharpness and solidity of crystal methamphetamine. Through cross-examination, the defense elicited an acknowledgement from Hass that some pieces of crystal methamphetamine can be much harder than other pieces. The defense also elicited testimony from Hass that, theoretically, crystal methamphetamine could pierce a plastic bag. The defense also argued that Jane Doe sustained her injuries not from defendant putting his fingers far down her throat, but instead from the sharp methamphetamine, either when she swallowed it or when defendant caused her to gag it back up.

Furthermore, Northom's testimony would not have addressed any other injury sustained by Jane Doe such as the injury she sustained from hitting her head on the pavement.

Given the jury's rejection of the sexual assault charges, and the lack of an apparent reason for sticking one's hand into someone's mouth other than the reason defendant testified about, we conclude that it is not reasonably probable that defendant would have obtained a more favorable result had the trial court not precluded Northom's testimony about the physical characteristics of crystal methamphetamine and the aspects of Hass's testimony with which he disagreed. (*Watson, supra*, 46 Cal.2d at p. 836.) The jury's verdicts and great bodily injury findings were consistent with defendant's own testimony.

### E. Constitutional Claims and the Ineffective Assistance of Counsel

As he did with regard to the exclusion of Williams's proffered testimony, defendant asserts that his trial counsel were ineffective for failing to argue the applicable constitutional grounds with regard to the exclusion of Northom's testimony. Specifically, he asserts that his trial attorneys were constitutionally ineffective for failing to argue that the court's ruling denied him a meaningful opportunity to present a defense on the great bodily injury enhancement, and deprived him of his rights to due process and a fair trial.

45

Again, by "failing to object below, defendant forfeited his claim that the exclusion of this evidence violated his constitutional rights . . . ." (*Daniels, supra*, 176 Cal.App.4th at p. 320, fn. 10.)

We turn directly to prejudice once again. (See *Strickland, supra*, 466 U.S. at p. 697.) And again, we note that the *Watson* standard for harmless error is substantially the same as the prejudice prong of *Strickland*. (*Ocegueda, supra*, 247 Cal.App.4th at p. 1407, fn. 4.) For the same reasons we discussed in our *Watson* analysis in this Discussion part, we conclude that, even if defendant's trial attorneys' performance was deficient for failure to raise the constitutional grounds upon which he relies on appeal, he was not prejudiced as a result.

## V. Prosecutorial Misconduct in Closing Arguments and Ineffective Assistance of Counsel

### A. Additional Background

### 1. Remarks Regarding Search Warrant Affidavit

As noted, Gregory obtained a search warrant looking for communications between defendant and C.J., the female friend defendant went to visit before the incident underlying the charged offenses. In the defense closing argument, trial counsel pointed out that Gregory stated in his affidavit that defendant's pants *and underwear* were all the way down. Counsel argued this was "completely false," as demonstrated by Lefkowitz's trial testimony. Counsel further argued: "How is it that this man and this detective used his powers to get a search warrant, convince the judge to do so by telling information that was false? We know that it's false because we heard Officer Lefkowitz testify. So when he signed that affidavit, it was false." Counsel also emphasized that Gregory claimed in his affidavit that there were six different Facebook messages between defendant and C.J. during the relevant time, but, according to the evidence produced at trial, there were only two. Counsel posed a question; how could Gregory offer information in his affidavit

46

seeking a search warrant that was wrong?  Counsel then furnished his own answer: "They're liars."

In his rebuttal closing argument, the prosecutor told the jury:  "There was some discussion about the search warrants somehow containing false information.  *Ladies and Gentlemen, if a search warrant is containing false information, and the probable cause is not there because of the officer's lied [sic] or were incredible sloppy, [sic] the evidence gets suppressed*."  (Italics added.)  Defendant's trial counsel objected and requested a sidebar, asserting that it was inappropriate for the prosecutor to say that the defense could have had the evidence suppressed.  However, counsel did not provide a legal reason for why the argument was improper.  Nor did counsel request a curative instruction.  The court overruled the objection, ruling that the remark was fair comment "to the inference that [the defense] raised in [its] closing argument, and the search warrant was likely insufficient, and the officer lied in obtaining it."

## 2.  Remarks Regarding the Voluntariness of Jane Doe's Testimony

In his closing argument, trial counsel noted that a criminal defendant has every right not to testify.  He stated of defendant:  "He didn't have to get up there and talk to you.  Not only did he get up there and talk to you, he came and physically showed you what happened between him and the police."

The prosecutor in rebuttal stated:  "a moment ago [trial counsel] pointed out that [defendant] didn't have to talk to you, didn't have to come and tell his story.  That's absolutely true.  But neither did Jane Doe.  *She didn't have to come and testify.  We can't throw her in jail if she refuses*.  So she came here and had the courage to sit on the stand and look at you and tell you her story."  (Italics added.)  No objection was made to these remarks.

## 3.  Remarks Raising the Possibility of Other Victims

During redirect examination, Dr. Atwal described sexual predation.  She stated: "Sexual predation is being a sexual predator.  So, for example, Harvey Weinstein has

been in the news.  So there's all of these individuals that are coming out saying that he exploited them sexually.  So multiple victims over the span of a long period of time is a definition of a sexual predator."  During his recross-examination, the prosecutor asked Dr. Atwal, "Harvey Weinstein got away with it for some 30 years, didn't he?"[18]

In an apparent effort to address Dr. Atwal's testimony that defendant showed no signs of sexual predation, the prosecutor sought to present testimony by Gregory in rebuttal eliciting that in the course of his work, he found that in some cases, the accused's family and friends had no idea about the acts the accused had committed.  The court conducted an Evidence Code section 402 hearing and ultimately precluded the evidence on Evidence Code section 352 grounds.

In closing argument, defendant's trial counsel contrasted this case with Harvey Weinstein's, stating, "in [Weinstein's] case there's over 40 people now that have come out, and you know what it is?  Everybody knew."  Counsel continued:  "Now, that means that their theory saying that oh, no other sex cases, that friends and family do not know about it.  How is it that this man has no red flags?  They want you to believe that he goes from 0 to 60 just like that because he had a little bit of alcohol in him, because his wife just had a baby, and because he couldn't have sex with [C.J.].  So then he just went and turned into a violent rapist, kidnapper and rapist.  No precursors for that.  No other allegations ever made.  Nobody in his family or friends ever would think that he did it. [¶]  They want you to believe that he's a violent rapist when he has nothing in his history that would indicate anything of the sort.  And then he's suggesting well, the only way we would know, is if he had been arrested or charged before.  So we don't know, but we do

_____

[18]  In his appellate briefing, defendant asserts that the prosecutor was the first to mention Weinstein and he did so by way of this question.  However, the record demonstrates that Dr. Atwal mentioned Weinstein during redirect examination by defendant's trial counsel as indicated *ante*, and the prosecutor's question was posed to Dr. Atwal thereafter.

know.  We do know because you heard everything about [defendant].  [¶]  You don't think if he had any incidents before, sexual or violent or otherwise you would have heard about it?  Of course you would have, but there isn't."

In his rebuttal argument, the prosecutor responded to Dr. Atwal's testimony about sexual predators having a pattern and trial counsel's closing argument.  He stated:  "They groom people.  *Just because there haven't been any identified or come forward or there's been no other arrests or prosecutions, doesn't mean there's not more victims out there.  It's possible that we just haven't found them yet.*  We know this from Dr. Atwal's -- when Dr. Atwal talked about Harvey Weinstein, we know this from Jerry Sandusty.  [*sic*]  We know about this from Bill Cosby, everyone.  *There's some of their closest friend [sic] are shocked when they discover what these people are capable of.*"  (Italics added.)  Defendant's trial counsel did not object to these remarks.

### B.  Defendant's Contentions

Defendant asserts that the prosecutor committed misconduct during his rebuttal closing argument when he:  (1) discussed the search warrant affidavit because he discussed matters not in evidence, misstated the law, and improperly vouched for the prosecution's witnesses; (2) praised Jane Doe for voluntarily testifying because he argued matters not in evidence in order to improperly vouch for her credibility and he misstated the law; and (3) raised the possibility that defendant had sexually victimized other people and thus argued facts not in evidence, invited the jurors to speculate, and appealed to the passions and prejudices of the jurors.

### C.  Standards Governing Prosecutorial Misconduct

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' "  [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct

49

even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He [or she] has the right to fully state his [or her] views as to what the evidence shows and to urge whatever conclusions he [or she] deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.) " ' "[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] "A prosecutor may 'vigorously argue [the] case and is not limited to "Chesterfieldian politeness" ' [citation] . . . ." ' [Citation.] Nevertheless, *'[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record*. [Citations.] Nor is a prosecutor permitted to place the prestige of [the prosecutor's] office behind a witness by offering the impression that [the prosecutor] has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [the prosecutor's] comments cannot be characterized as improper vouching.' " (*People v. Ward* (2005) 36 Cal.4th 186, 215, italics added.)

### D. Forfeiture

The Attorney general asserts that defendant forfeited his claims of prosecutorial misconduct by failing to object and, in the one instance where he did object, by failing to request an admonition. " 'As a general rule a defendant may not complain on appeal of

prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) "[T]rial counsel's failure to object in a timely manner to asserted prosecutorial misconduct . . . results in the forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 757 (*Dykes*), citing *People v. Stanley* (2006) 39 Cal.4th 913, 952 (*Stanley*).)

Defendant's trial attorneys did not object to the prosecutor's rebuttal arguments indicating that they could not "throw [Jane Doe] in jail" if she refused to testify and raising the possibility that defendant had other, unknown sexual assault victims. As such, defendant forfeited any claims of prosecutorial misconduct in connection with these arguments. (*Dykes, supra*, 46 Cal.4th at p. 757; *Stanley, supra*, 39 Cal.4th at p. 952.)

With regard to the prosecutor's discussion about the search warrant affidavit, trial counsel objected and argued to the trial court that the prosecutor's remark was "a completely inappropriate comment for him to say that we could have, and it could have been suppressed. [¶] First of all, we got that document the day before. It was the last discovery we have, and I'm just -- clearly, I mean, there's -- it's an improper argument." Trial counsel did not give a specific legal reason why the comment was inappropriate or improper. "Counsel has an obligation to state the '*specific ground* for an objection in order to preserve the issue for appeal.' " (*People v. Reyes* (2016) 246 Cal.App.4th 62, 77, quoting *People v. Thomas* (2012) 54 Cal.4th 908, 938 & citing *Stanley, supra*, 39 Cal.4th at p. 952.) By merely objecting on the grounds of "inappropriate comment" and "improper argument," defendant forfeited the particular arguments he makes on appeal. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 560-561 [the defendant appropriately concedes that, "by objecting only one time each on the vague ground of 'improper argument' during the prosecutor's initial and rebuttal closing arguments," he forfeited his claim of prosecutorial misconduct].)

51

We do not agree with defendant's argument on appeal that raising an appropriate and specific objection would have been futile, excusing defendant from making the specific legal objection or requesting an admonition.  (See *Hill, supra*, 17 Cal.4th at p. 820.)  Trial counsel had a sidebar conference with regard to this particular remark by the prosecutor and thereby had the opportunity to make the specific nature of the objection, including its constitutional dimension, known.  By specifically explaining the legal basis for the objection – arguing facts not in evidence -- the argument should have triggered different thinking and a different ruling the trial court.  We do not agree that a timely and specific objection would have been futile.

## E.  Ineffective Assistance of Counsel

Defendant asserts that, to the extent that his prosecutorial misconduct claims are forfeited, he was denied the constitutionally effective assistance of counsel.  We conclude defendant has failed to satisfy his burden of proof.

### 1.  Remarks Regarding Search Warrant Affidavit

#### a.  Deficient Performance

The Attorney General asserts that the prosecutor's "brief comment about the search warrant was proper."  The Attorney General asserts that the comment was directly responsive to defense arguments, and referenced the "commonly understood idea that defendants have various legal options to challenge the veracity of police conduct."

In arguing to the jury that, "if a search warrant is containing false information, and the probable cause is not there because of the officer's lied [*sic*] or were incredible sloppy, [*sic*] the evidence gets suppressed," the prosecutor improperly argued facts not in evidence.  There was nothing before the jury concerning the circumstances under which evidence will be suppressed.  It is true that " '[c]ounsel may argue facts not in evidence that are common knowledge or drawn from common experiences.' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 908, quoting *People v. Young* (2005) 34 Cal.4th 1149, 1197; accord, *Hill, supra*, 17 Cal.4th at p. 819.)  But as our high court recently observed,

52

" '[F]acts are deemed within the common knowledge of the jury only if they are matters of common human experience or well known laws of natural science.' " (*People v. Rodriguez* (May 21, 2020, S251706) ___ Cal.5th ___, ___ [2020 Cal. Lexis 3152, *11-12; 2020 WL 2563833, *4] (*Rodriguez*), quoting *People v. Love* (1961) 56 Cal.2d 720, 732, disapproved on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2 & citing *People v. Davis* (2013) 57 Cal.4th 353, 360.)[19] The standards applicable to traversing search warrants and the circumstances under which evidence will be suppressed are not matters commonly known by lay jurors. Indeed, it can be argued that the movies, television and the media often misstate the law on such matters as the suppression of evidence in criminal cases.

Moreover, the prosecutor's statement – "if a search warrant is containing false information, and the probable cause is not there because of the officer's lied [*sic*] or were incredible sloppy, [*sic*] the evidence gets suppressed" – suggested that a court had already reviewed the matter and because the jury heard evidence from defendant's Facebook account that was the fruit of the search warrant, a judge had already determined Gregory's veracity.

Beyond the record lacking evidence explaining the process for traversing search warrants and the judicial determination as to Gregory's veracity implied by the prosecutor, the prosecutor's statement was also misleading on the law. "A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must

---

[19] While our high court recently discussed the prohibition against arguing facts not in evidence in *Rodriguez*, the prohibition is not new. Indeed, the California District Attorney's Association ethics manual references this prohibition. It warns: "Referencing to facts not in evidence also constitutes misconduct. '[S]uch statements tend to make the prosecutor his own witness – offering unsworn testimony not subject to cross-examination.' " (CDAA (2016) Professionalism, A Sourcebook of Ethics and Civil Liability Principles for Prosecutors, Ch. X, p. 16.)

conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse." (*People v. Scott* (2011) 52 Cal.4th 452, 484 (*Scott*), citing *Franks v. Delaware* (1978) 438 U.S. 154, 154-156 [57 L.Ed.2d 667] & *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 988-989.) "[T]he defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*Scott*, at p. 484.) In other words, no evidence is suppressed if misrepresentations are innocent or negligent. Nor is evidence suppressed if the warrant can be corrected to omit intentionally false information and probable cause remains. While the prosecutor briefly mentioned "and the probable cause is not there," his comment was misleading as to the "correct and retest" mechanism in the law. Even if there had been a motion to traverse, a trial court could have found Gregory lied and still not suppressed the evidence. Indeed, it does not appear that whether both the defendant's pants *and underwear* were down when he came out of the bushes was material enough to have vitiated the probable cause for the warrant. Indeed, under such circumstances a defendant may opt not to move to traverse a warrant and as a consequence, there would have been no pretrial determination about Gregory's veracity by the trial court whatsoever.

Thus, the prosecutor's statement both argued facts not in evidence and was a misleading on the law. We conclude that there appears to be no satisfactory explanation for counsel's failure to register these specific objections or to request an admonition. (See *Ledesma, supra*, 43 Cal.3d at p. 218.) Therefore, we conclude that defendant's trial attorneys' performance was deficient for failure to register *a specific objection on these grounds* to the prosecutor's statement and request an admonition.

54

### b. Prejudice

We conclude, however, that defendant was not prejudiced as a result of his attorneys' deficient performance in this regard.

The remark was isolated and had little relevance to any issue the jury was required to resolve. The trial court instructed the jury that the attorneys' remarks are not evidence (CALCRIM Nos. 104, 222), and that the jury alone must judge the credibility of the witnesses (CALCRIM Nos. 105, 226). "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Moreover, the jury's verdict on the charged sex offense further shows the prosecutor's comment did not prejudice defendant. The credibility contest here was between Jane Doe and defendant. Gregory's testimony had no impact. The jury rejected the sex offenses, so whether defendant was seen with both his pants and underwear down turned out to be of no consequence. Indeed, Lefkowitz told the jury defendant's underwear was not down. In the end, the jury returned an assault verdict that was consistent with defendant's own testimony and reflected a rejection of the prosecution's central theory. And as we have noted, the kidnapping and false imprisonment convictions were supported by Lefkowitz's testimony concerning where he saw defendant and Jane Doe emerge from the bushes relative to the street and her condition at the time.

We conclude that defendant has not shown there is a reasonable probability he would have received a more favorable result had trial counsel provided specific objections to the prosecutor's improper remarks. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) Therefore, defendant has failed to show prejudice.

## 2. Remarks Regarding the Voluntariness of Jane Doe Testimony

### a. Deficient Performance

In rebuttal, the prosecutor argued: "a moment ago [trial counsel] pointed out that [defendant] didn't have to talk to you, didn't have to come and tell his story. That's absolutely true. But neither did Jane Doe. *She didn't have to come and testify. We can't throw her in jail if she refuses. So she came here and had the courage to sit on the stand and look at you and tell you her story.*" (Italics added.)

This statement argues facts not in evidence. There is no evidence indicating whether Jane Doe appeared pursuant to a subpoena compelling her appearance or whether she appeared voluntarily. Nor is there evidence indicating Jane Doe knew she had a choice not to testify. And there was no evidence in the record indicating the prosecutor could not "throw her in jail" if she refused to appear or testify. To be sure, Code of Civil Procedure section 1219, subdivision (a), shields sexual assault victims from contempt for refusing to testify.[20] But that provision in law is beyond common knowledge.

The prosecutor's argument was clearly improper. And there appears to be no satisfactory explanation for counsel's failure to object. (See *Ledesma, supra*, 43 Cal.3d at p. 218.) Trial counsels' performance in failing to object to the remark was deficient.

The Attorney General asserts that the remarks addressed by the prosecutor were directly responsive to trial counsel's closing argument, in which he "lauded [defendant] for taking the stand." The Attorney General asserts that the prosecutor merely reminded the jury that, to the extent that defendant deserved credit for his willingness to testify, so

---

[20] Code of Civil Procedure section 1219, subdivision (b), provides in pertinent part: "a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault . . . for contempt if the contempt consists of refusing to testify concerning that sexual assault . . . ."

too did Jane Doe.  To an extent this is true.  However, the prosecutor exceeded merely responding, permissibly, to trial counsel's argument by arguing facts not in evidence.

### b. Prejudice

Defendant has failed to establish prejudice.  To say that it took courage to testify is both a fair comment on the evidence and a statement of the obvious.  The fleeting comment concerning the prosecutor's inability to compel Jane Doe's testimony was inconsequential.  It is not reasonably probable that, had trial counsel objected, defendant would have achieved a more favorable result.

Defendant emphasizes the concerns regarding Jane Doe's credibility, including her criminal history and her denial of part of that history, her drug use, and evidence relevant to her character for dishonesty offered by Imogean.  Defendant maintains that the prosecutor's remark, and indeed each of his remarks cited by defendant, shored up Jane Doe's otherwise questionable credibility.  The Attorney General responds that trial counsel cross-examined Jane Doe extensively on her criminal history, drug use, and prior inconsistent statements.  The defense also presented evidence addressed to Jane Doe's credibility and honesty.  We are of the opinion that the prosecutor's remark did not significantly impact Jane Doe's credibility.  Again, even with the prosecutor's improper remarks, the jury's verdicts indicated it rejected much of Jane Doe's testimony.  Instead, it returned verdicts that are consistent with defendant's own testimony and other evidence the jury heard.

Defendant has failed to establish there is a reasonable probability he would have received a more favorable result had trial counsel objected to the prosecutor's improper argument.  (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

### 3. Remarks Suggesting Defendant Had Other Victims

#### a. Deficient Performance

The third instance of prosecutorial misconduct is the most disturbing. In rebuttal, the prosecutor argued: "They groom people. Just because there haven't been any identified or come forward or there's been no other arrests or prosecutions, *doesn't mean there's not more victims out there. It's possible that we just haven't found them yet.* We know this from Dr. Atwal's -- when Dr. Atwal talked about Harvey Weinstein, we know this from Jerry Sandusty. [*sic*] We know about this from Bill Cosby, everyone. There's some of their closest friend [*sic*] are shocked when they discover what these people are capable of." (Italics added.)

In *Fuiava, supra*, 53 Cal.4th 622, upon which defendant relies, our high court concluded a number of prosecutorial misconduct claims were forfeited. (*Id*. at pp. 726-729.) But the court went on to say: "we take this opportunity to comment on an aspect of the prosecutor's penalty phase closing argument that, although forfeited as a basis for reversal on appeal, warrants condemnation. In two instances the prosecutor improperly suggested to the jury that it speculate regarding aspects of defendant's violent criminal history that were not presented at the trial—by describing defendant as a 'killing machine' (although there was no evidence that defendant had killed anyone other than Deputy Blair), and then, with regard to defendant's victims, asking that the jury speculate '*How many others are there*?' " (*Id*. at pp. 728-729, italics added.) "Certainly a prosecutor should not invite the jury to speculate . . . ." (*People v. Yeoman* (2003) 31 Cal.4th 93, 149.)

There was no evidence presented at trial about other victims. But the prosecutor's comment implied facts not in evidence and invited the jury to speculate that defendant might have committed other acts of sexual misconduct for which he was not apprehended. In short, the prosecutor invited the jury to speculate that defendant was a sexual predator in a league with Harvey Weinstein, Jerry Sandusky, or Bill Cosby.

" 'While counsel is accorded "great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation]," counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence.' " (*People v. Collins* (2010) 49 Cal.4th 175, 209, quoting *People v. Valdez* (2004) 32 Cal.4th 73, 133-134.)  The remarks amounted to a sort of burden shifting, imposing on defendant the burden of proving that there were *not* other victims out there.[21]

We consider these remarks to be highly improper and, like our high court in *Fuiava*, we condemn such arguments.  And we discern no satisfactory explanation for counsel's failure to object.  (See *Ledesma, supra*, 43 Cal.3d at p. 218.)  Accordingly, we conclude that defendant's trial counsel's performance was deficient for failing to object to these remarks.

### b. Prejudice

The remarks at issue, as improper as they were, were addressed solely to the sex assault theory of the case.  The jury rejected the prosecution's theory that defendant committed the offenses for the purpose of raping Jane Doe, and instead returned verdicts that were consistent with defendant's testimony about retrieving his methamphetamine and other evidence not related to the prosecutor's improper comment.  We conclude there is not a reasonable probability that defendant would have received a more favorable result had trial counsel's performance not been deficient in failing to object to these obviously improper remarks.  (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

---

[21] Under Evidence Code section 1108, the prosecution can introduce evidence of other acts of sexual misconduct, but the burden is on the prosecution to establish such acts by a preponderance of the evidence.  (See CALCRIM No. 1191; *People v. Phea* (2018) 29 Cal.App.5th 583, 608-609.)

**4. Prosecutorial Misconduct - Cumulative Prejudice**

In assessing the prejudice of multiple instances of prosecutorial misconduct, "we consider the cumulative effect of [the] misconduct because the number and gravity of incidents 'raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone.' " (*People v. Woods* (2006) 146 Cal.App.4th 106, 117, quoting *Hill, supra*, 17 Cal.4th at p. 845.) Thus, where we are considering the forfeited contentions of prosecutorial misconduct under the framework of ineffective assistance of counsel, we may also consider the cumulative effect of counsel's deficient performance. (See generally *People v. Smithey* (1999) 20 Cal.4th 936, 1017-1018 [considering the cumulative effect of the defendant's ineffective assistance of counsel claims and prosecutorial misconduct claims].) As to each of defendant's three claims of ineffective assistance of counsel based on failure to object to prosecutorial misconduct, we have determined that defendant has failed to establish he was prejudiced by any deficient performance. We further conclude "defendant's claim based upon the cumulative effect of ineffective assistance of counsel also must fail." (*Id.* at p. 1017.) Again, the jury rejected the prosecution's attempt to convince the jury the crimes here were sexually motivated. Ignoring the prosecutor's overtures, the jury returned verdicts consistent with defendant's own testimony and other evidence in the case unrelated the prosecutor's misconduct.

## VI. Cumulative Error

Defendant asserts that the cumulative effect of the errors he alleges prejudiced him, mandating reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.) Any of the potential errors identified above "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one." (*People v.*

*Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no prejudice when considering defendant's claims separately. Viewed cumulatively, our conclusion is the same. Defendant was not deprived of a fair trial.

### VII. Section 654

### A. Defendant's Contentions

Defendant asserts that the trial court erred in failing to stay punishment for simple assault pursuant to section 654. He asserts that the simple assault was part of the same course of conduct that resulted in the kidnapping conviction and under the prosecution's theory of the case, the kidnapping and assault were both committed as the means of accomplishing rape. Defendant further asserts that the jury acquitted him of the offenses prosecuted under the sex assault theory, embracing defendant's theory that he had grabbed Jane Doe and put his fingers down her throat in an effort to retrieve his methamphetamine.

### B. Section 654 Sentencing Principles

Section 654, subdivision (a), provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336 (*Correa*).) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the

61

violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

When section 654 applies, the trial court must impose a sentence and then stay the *execution* of that sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed. (*People v. Duff* (2010) 50 Cal.4th 787, 796; *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197-1198; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469; *People v. Salazar* (1987) 194 Cal.App.3d 634, 640; *People v. Niles* (1964) 227 Cal.App.2d 749, 755-756; 1 Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2018) § 13:10, p. 13-51.) A concurrent sentence is still punishment; thus, it is improper to run the sentence concurrently. (*Duff*, at p. 796; *Alford*, at p. 1468; Couzens, at p. 13-51.)

## C. Analysis

We conclude that the concurrent sentence imposed on count 2, simple assault, was an illegal sentence. The trial court should have imposed sentence on that count, but stayed execution of the sentence pursuant to section 654.

The prosecution argued that defendant kidnapped and assaulted Jane Doe to rape her. The defense argued defendant had a different reason for his conduct. Given the jury's verdicts, we agree with defendant that the jury embraced his theory that he grabbed Jane Doe and put his fingers down her throat to retrieve his methamphetamine. The evidence upon which the jury necessarily based its verdict concerning the movement of Jane Doe established that the asportation element of the kidnapping was done to facilitate defendant's attempted retrieval of the methamphetamine. Thus, the evidence upon which the jury based its verdict with regard to the kidnapping and assault, established that these actions were incident to defendant's one objective—to retrieve his methamphetamine— and therefore he may be punished for the most serious of these two offenses, but not both. (§ 654; *Correa, supra*, 54 Cal.4th at p. 336.) We discern no evidence, consistent with the jury's verdict, that supports the conclusion that defendant had a separate intent or purpose

in kidnapping and assaulting Jane Doe. Accordingly, we will order execution of the sentence imposed on count 2 be stayed pursuant to section 654.

## VIII. Ability to Pay Fines and Fees

At sentencing, the trial court expressed concern about defendant's ability to pay fines and fees, and therefore elected to "order the minimal amount for the restitution fine under . . . Section 1202.4(b)," or $300, and a parole revocation fine in the same amount pursuant to section 1202.45. The court also ordered a $40 court operations assessment under section 1465.8 and a $30 conviction assessment pursuant to Government Code section 70373 as to each of defendant's three convictions. The court ordered victim restitution in the amount of $150. The court found defendant lacked the ability to pay for the presentence investigation report fee.

Defendant asserts that remand is required for the trial court to hold a hearing on his ability to pay the restitution fine (§ 1202.4, subd. (b)), the court operations assessment (§ 1465.8), and the conviction assessment (Gov. Code, § 70373). Defendant relies on *Dueñas, supra*, 30 Cal.App.5th 1157, decided almost exactly one year after defendant's sentencing, which held due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.

We are of the opinion that *Dueñas* was wrongly decided and hold that defendant was not entitled to an ability to pay hearing. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279-282; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted, Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917, 923-929.)

## DISPOSITION

The conviction of felony false imprisonment (§ 236, subd. (a)) and the true finding on the personal infliction of great bodily injury enhancement allegation (§ 12022.7, subd. (a)) attached to the felony false imprisonment conviction are reversed and the sentences

imposed thereon vacated. Execution of the six-month sentence imposed on count 2, assault (§ 240), is stayed pursuant to section 654. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.


                                    /s/
                              MURRAY, J.


We concur:


    /s/
RAYE, P. J.


    /s/
RENNER, J.